# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RAYMOND O. LONG, JR., | ) | |
| | ) | |
| Petitioner, | ) | Case No. 3:10-01010 |
| | ) | Chief Judge Haynes |
| v. | ) | |
| | ) | |
| JIM MORROW, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, Raymond O. Long, Jr., filed a pro se action seeking the writ of habeas corpus

to set aside his two state convictions for murder. (Docket Entry No. 1). After review of the pro

se petition, the Court appointed counsel for Petitioner and granted leave to file an amended

petition and ordered Respondent to answer the amended habeas petition. In his amended

petition,[1] Petitioner asserts the following claims.

> **Claim One**: In violation of the Fifth, Sixth and Fourteenth Amendments to the
> United States Constitution, the trial court erred in excluding a video of the prior
> inconsistent statement of the prosecution's key witness, Joseph Whitefield.

> **Claim Two**: In violation of the Fifth and Fourteenth Amendments to the United
> States Constitution, the trial court admitted testimonial hearsay evidence of prior
> bad acts.

---

[1]Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v.
Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R.
Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v.
Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended
petition to supersede the pro se petition and the claims therein. Unless adopted and supported by
legal memorandum, the Court deems the claims in the pro se petition to be waived.

**Claim Three**: Under the standards set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), the evidence was insufficient for any rational trier of fact to find Mr. Long guilty beyond a reasonable doubt of first and second degree murder.

**Claim Four**: In violation of the Sixth and Fourteenth Amendments to the United States Constitution, counsel rendered ineffective assistance for reasons including but [not] limited to:

> a.     Trial counsel failed to investigate and present evidence from Terrio Williams who was in possession of the murder weapon.

> b.     Trial counsel failed to sufficiently investigate and present an alibi defense based on Petitioner's parents and William Jarvis Grimes.

> c.     Trial counsel failed to develop and present expert ballistics evidence of the ejection patterns of the murder weapon.

**Claim Five**:  In violation of the Fifth and Fourteenth Amendments, the State violated the mandates of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Supreme Court decisions requiring the prosecution to provide criminal defendants with evidence in the Government's possession that could be considered exculpatory or that would serve to impeach the credibility of prosecution witnesses.

(Docket Entry No.16 Amended Petition at 7-14).

In his answer, Respondent asserts that the following claims were not presented to the

Tennessee Court of Criminal Appeals and are procedurally defaulted:

**Claim 1** alleges that the trial court erred in excluding the video of the prior inconsistent statements of Joseph Whitfield. The petitioner did not present this issue to the TCCA under a federal theory.

**Claim 2** alleges that the state court's evidentiary ruling violated the Fifth Amendment. The petitioner did not present Claim 2 to the TCCA under this federal theory.

**Claim 4, Subpart 3** alleges that counsel was ineffective for failing to develop and present expert ballistics evidence of the ejection patterns of the murder weapon. This claim was never presented to the TCCA.

**Claim 5** alleges that the State violated <u>Brady</u> and <u>Giglio</u> by failing to turn over

2

exculpatory and impeachment evidence regarding Joseph Whitfield.; by withholding impeachment evidence regarding Calvin Miles; and withholding polygraph evidence about Terrio Williams. These claims were never presented to the state courts.

(Docket Entry No. 17, Answer at 3).

As discussed in more detail below, in earlier proceedings, the Court denied the Petitioner's motions to conduct discovery. (Docket Entry No. 26). After a review of the record, the Court ordered parties to file any additional memoranda on their respective claims and defenses. Id. In his brief, Petitioner again argues for reconsideration of the Order denying discovery as well as a request for an evidentiary hearing. (Docket Entry No. 33). Petitioner also filed a motion to reconsider that Order denying discovery (Docket Entry No. 29) to which Respondent filed his response. (Docket Entry No. 34). The Court granted leave for Petitioner to file a reply. (Docket Entry Nos. 36 and 37). Petitioner also was granted leave to file a reply to Respondent's brief on the merits of the petition. (Docket Entry Nos. 39, 40 and 41). Petitioner also filed a motion for an evidentiary hearing. (Docket Entry No. 42).

For the reasons set forth below, Petitioner's motion to reconsider is granted, but the Court reaffirms its earlier ruling that good cause has not been shown to justify the requested discovery given the clear availability of the information at the time of Petitioner's trial and post conviction proceedings as well as the ambiguity of the cited materials. The Court also concludes that Petitioner's motiont for an evidentiary hearing should be denied as Petitioner had opportunities to pursue the cited factual contentions in the State courts at trial and during his state post conviction proceedings. After a review of the state record, Petitioner's evidentiary submissions, the State courts' decisions and the applicable law, the Court concludes the petition should be

3

denied because the State courts reasonably decided Petitioner's exhausted claims and Petitioner's unexhausted claims are procedurally defaulted without a showing of cause or prejudice.

## A. Petitioner's Motions for Discovery and a __Martinez__ Hearing

### 1. The Discovery Motion

In earlier proceedings, the Court denied Petitioner's motion for discovery (Docket Entry No. 26). In his motion to reconsider (Docket Entry No. 29) and in his brief, (Docket Entry No. 33), Petitioner contends that the Court possesses the discretion to reconsider its earlier Order on discovery and that the transcript submitted to support discovery is from the State prosecutor's file.

In its earlier Order (Docket Entry No. 26), the Court ruled that the subjects on which discovery was sought, involved matters that had already been presented to the State courts and Petitioner had an opportunity to develop any discovery of those issues in the State courts. Id. As the Supreme Court emphasized: "In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652 (2004); see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam) and Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court").

Rule 6(a) of the Rules Governing Section 2254 cases sets a good cause standard for discovery that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Id. In Bracy v. Gramley, 520 U.S. 899, 908-909 (1997), the Supreme Court described the standard for good cause under Rule 6(a) as "'where specific allegations before the court show reason to believe that

4

the petitioner may, if the facts are fully developed, be able to demonstrate that he is... entitled to relief, it is the duty of the court to provide the necessary facilities and procedure for an adequate inquiry.'" (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 300 (1969)); <u>accord</u> <u>Williams v. Bagley</u>, 380 F.3d 932, 976 (6th Cir. 2004).

In <u>Stanford v. Parker</u>, 266 F.3d 442 (6th Cir. 2001), the Sixth Circuit stated as a general rule that in a habeas action, discovery cannot be employed as a "fishing expedition":

> Habeas petitioners have no right to automatic discovery. A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6. <u>See</u> <u>Bracky v. Gamley</u>, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); <u>Byrd v. Collins</u>, 209 F.3d 486, 515-16 (6th Cir. 2000). . . . The burden of demonstrating the materiality of information requested is on the moving party. <u>See</u> <u>Murphy v. Johnson</u>, 205 F.3d 809, 813-15 (5th Cir. 2000). The district court applied the correct legal standard in light of the evidence and the state court proceedings. The discovery sought by Stanford would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor. To the contrary, Stanford's requested discovery, when reviewed in light of the recently examined record, falls more in the category of a fishing expedition. We will not find that a district court erred by denying a fishing expedition masquerading as discovery.

<u>Id.</u> at 460.

Moreover, "[c]onclusory allegations are not enough to warrant discovery under Rule 6, the petitioner must set forth specific allegations of fact." <u>Ward v. Whitley</u>, 21 F.3d 1355, 1367 (5th Cir. 1994) (footnote omitted). "Generalized statements about the possible or speculative existence of evidence do not constitute 'good cause'." <u>Munoz v. Keane</u>, 777 F. Supp. 282, 287 (S.D.N.Y. 1991); <u>see also</u> <u>Linareas v. Senkowski</u>, 964 F. 2d 1295 (2d Cir. 1992); <u>Aponte v. McKee</u>, No. 2:06-cv-11216-DT, 2007 WL 734986 (E.D. Mich. March 8, 2007.) In a word, "a petitioner must produce specific evidence that supports his claim that the requested material will yield the asserted information." <u>Id.</u> at *3 (citing <u>Linares</u>, 964 F.2d at 1295). Although habeas

proceedings are, "important in assuring that constitutional rights are observed, [that principle] is secondary and limited. Federal courts are not forums in which to relitigate state trials." Id.

Discovery must also be considered in the context of 28 U.S.C. § 2254(e)(1)[2] on the presumption of correctness of state court findings.

> Because Petitioner failed to rebut the statutory presumption of correctness that the federal habeas court must award to the factual findings of the state courts, the district court properly concluded that it was required to defer to those factual findings. Furthermore, given this conclusion, we would be hard-pressed to say that the district court abused its discretion in denying further discovery on these issues.

Byrd v. Collins, 209 F.3d 486, 516 (6th Cir. 2000).

Consideration of Section 2254(e)(2)[3] of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1274 ("AEDPA"), that governs evidentiary hearings

---

[2]Section 2254(e)(1) provides in part: "[A] determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

[3]Section 2254(e)(2) provides the following:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> **(A)** the claim relies on--
>
> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

in habeas actions, is also relevant given that discovery is intended to supplement the state record. In <u>Lott v. Coyle</u>, 261 F.3d 594 (6th Cir. 2001), the Sixth Circuit stated: "We review a district court's limitation on the scope of discovery for an abuse of discretion." <u>Id.</u> at 602 (citing 28 U.S.C. § 2254(e)(2)). The consideration of Section 2254(e)(2) in this context is shared by other circuits and district courts. <u>See</u> <u>Goldsby v. Czerniak</u>, 142 Fed. App'x 303, 305 (9th Cir. 2005) (citing <u>Holland v. Jackson</u>, 542 U.S. 649 (2004) (<u>per curiam</u>)); <u>Boyko v. Parke</u>, 259 F.3d 781, 790 (7th Cir. 2001) ("When expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing."); <u>Moen v. Czerniak</u>, No. Civ. 02-10-JE, 2004 WL 1293920 at *1 (D. Or. June 10, 2004) ("Discovery under Rule 6 must be considered in light of the provisions of 28 U.S.C. § 2254(e)(2) which limit the scope of federal habeas corpus review to the state court record, except in certain circumstances..."). This view, however, is not uniform as reflected in the decisions analyzed and the holding in <u>Ashworth v. Bagley</u>, No. C-2-00-1322, 2002 WL 485003 at *13 (S.D. Oh. March 28, 2002) ("expansion of the record pursuant to Rule 7 [of the Rules Governing Section 2254 Cases] is not governed by the restrictions on evidentiary hearings set forth in § 2254(e)(2), when petitioner seeks to present facts that were not considered by the state courts."). This Court is bound by the Sixth Circuit's language in <u>Byrd</u> and <u>Lott</u> and therefore must consider Section 2254(e)(2) in evaluating the Petitioner's discovery requests.

Petitioner's discovery request cites Petitioner's trial counsel's cross examination of Joseph Whitfield, a key state witness, with inconsistencies between his trial testimony and his pretrial testimony and statements to police officers. (Docket Entry No.18-3, Trial Tr. Vol. II, at

7

43-72). Petitioner also cites his trial counsel's effort to play the video or audio tapes of Whitfield's prior testimony and/or statements to police officers on the extent of the inconsistencies that the state trial court denied. Id. In addition, according to Petitioner, the State prosecutor disclosed as part of the State's discovery production, a videotaped interview with Joseph Whitfield.

For his discovery request in this action, Petitioner cites a transcript that purports to reference the potential threat of or an actual arrest warrant for Whitfield during his second videotaped interview with police officers. Petitioner quotes the following excerpt of this second interview of Whitfield by Detectives Freeman and Coleman of the Metropolitan Nashville Police Department

> WHITFIELD: I feel it's a burden 'cause sometimes innocent people still get messed up for tellin' the truth.
>
> DET. FREEMAN: You talkin' about you?
>
> WHITFIELD: Just in general.
>
> DET. FREEMAN: Well it's like I said, we're gonna take you home.
>
> **WHITFIELD: So I don't have to worry about that warrant**?
>
> DET. FREEMAN: Well no it's like he said before. What's today the 2nd?
>
> DET. COLEMAN: Yep.
>
> DET. FREEMAN: 9 – I got 9:25, is that right?
>
> WHITFIELD: Um hm.
>
> DET. COLEMAN: That's correct.

(Docket Entry No. 24-1 at 2) (emphasis added).

Petitioner cites these materials to contend that the State prosecutor's discovery response and Whitfield's trial testimony were false in that both represented that the officers did not promise or threaten Whitfield to secure his cooperation. Petitioner's submission reflects that the state prosecutor represented the following response concerning <u>Brady</u> material:

> 8. In accordance with the decision in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), all items of exculpatory nature, if any there be, will be furnished to defense counsel if and when any such item or information becomes known to the State. See attached.
>
> Defense counsel may assume that any specific request which is not answered is either not discoverable or the information requested is not available . The State cannot provide evidence material to the defense or exculpatory to the defendant until such is made known to the State.
> This response is based upon information available to the State at this time. If any additional information becomes known to the State, it will be promptly provided to defense counsel.

Docket Entry No. 29-3, at 3-4).

The cited transcript is based upon a tape that Petitioner concedes is difficult to discern. "The above excerpt indicates that some discussion about an existing or threatened warrant took place before the videotape was turned on. **The details of that prior discussion are unclear**, but the above exchange suggests a reasonable likelihood that detectives either threatened to take out a warrant absent Whitfield's cooperation or agreed to resolve an existing warrant favorably in exchange for his cooperation" (Docket Entry No. 29, at 2) (emphasis added). Respondent also states that "The defendant's <u>Brady</u>/<u>Giglio</u> claim is based upon a transcript which uses the word 'warrant' and which word is unintelligible on the videotape itself. The transcript is not certified. The videotape was turned over to the defense prior to trial. Thus, the petitioner cannot prove that there was a threat or promise based upon so little evidence." (Docket Entry No. 35, Respondent's

Reply Brief at 1). Despite the tape's ambiguity, Petitioner submitted a transcript with the word "warrant". In its reply to the State's response in opposition, Petitioner submitted the affidavit that the above transcript is from the District Attorney's files on Petitioner. In addition, Petitioner's supporting affidavit cites the similarity of this transcript to the heading and format of an earlier transcript of Petitioner's first interview with the police officers.

As to the governing law for this type of claim, where a prosecutor withholds exculpatory material from the defense, the prosecutor violates the defendant's right to due process, explained in Brady v. Maryland, 373 U.S. 83, 87 (1963), that encompasses impeachment material. Giglio v. United States, 405 U.S. 150, 153-55 (1972). For a Brady claim, Petitioner must make some showing that proves that the State suppressed evidence. United States v. Warshak, 631 F.3d 266, 300 (6th Cir. 2010). Petitioner must prove "(1) that the evidence was favorable to him, (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued." Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002). As to the merits of this Brady claim, the Sixth Circuit reiterated the evidentiary requirements to obtain any habeas relief:

> Brady requires the prosecution to disclose exculpatory and impeachment evidence that is material either to guilt or to punishment. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A Brady violation has three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.

Jalowiec v. Bradshaw, 657 F.3d 293, 302–03 (6th Cir. 2011) (quoting Beuke v. Houk, 537 F.3d 618, 633 (6th Cir. 2008) (internal quotation marks and citations omitted)). Yet, "Brady does not apply when the defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" Owens v. Guida, 549 F.3d 399, 417 (6th Cir. 2008)

(quoting Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998)).

In addition, "the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." United States v. Bagley, 473 U.S. 667, 679 n.8 (1985). This doctrine applies when "the prosecution knew, or should have known, of the perjury." United States v. Agurs, 427 U.S. 97, 103 (1976). In such cases, the judgment "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. (citing Giglio, 405 U.S. at 154). As to whether a prosecutor failed to correct false testimony, Petitioner must prove that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. Coe v. Bell, 161 F.3d 320, 343 (6th Cir.1998). Petitioner's burden is to show that the testimony was actually perjured, United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987), and was "'indisputably false' testimony." Rosencrantz v. Lafler, 568 F.3d 577, 585 (6th Cir. 2009). "A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" Id. at 583 (citation omitted). If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required. Knighton v. Mullin, 293 F.3d 1165, 1174 (10th Cir. 2002).

First,"[a]s a general rule, '[t]aped recordings are admissible unless the incomprehensible portions of the tapes are so substantial as to render the recordings as a whole untrustworthy'." United States v. Segines, 17 F.3d 847, 854 (6th Cir.1994) (quoting United States v. West, 948 F.2d 1042, 1044 (6th Cir.1991) with other citations omitted)). Moreover, "[t]he preferred practice is for the court not to submit transcripts to the jury unless the parties stipulate to their

accuracy" and "[t]he district court abuses its discretion only 'where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy'." United States v. Scarborough, 43 F.3d 1021, 1024 (6th Cir. 1994) (quoting United States v. Scaife, 749 F.2d 338, 345 (6th Cir.1984)). Here, whatever the similarity in the headings and the format of the transcripts of the Whitfield interviews, the fact remains that the tape is undisputedly unclear. In any event, this tape was produced to Petitioner, but is not filed in this action. Even if the tape were filed, Petitioner's discovery motion should be denied as unreliable.

Second, any implications of this tape could have been pursued in Petitioner's trial and post conviction proceedings in the State courts. If there were an arrest warrant, prior to trial or during his state post-conviction proceedings, Petitioner could have sought discovery, filed affidavits, taken depositions and requested subpoenas in the post conviction proceedings. See Tenn. Code Ann. § 40-30-209. Depositions are available in the state post-conviction proceeding Strouth v. State, 755 S.W.2d 819, 827 (Tenn. Ct. Crim. App. 1986) ("In a deposition taken in 1982 for Dicks's post-conviction hearing, McMahan testified that he had been offered money and accepted the offer, because '[y]ou know, no man is going to turn down a thousand bucks for telling the truth.'");Sample v. Colson, 958 F. Supp. 2d 865, 892 n.25 (W.D. Tenn. 2013) ("Discovery of the DA's case file is little more than a formality given the fact that Petitioner was at one time entitled to obtain a copy of the files pursuant to the Tennessee Public Records Act, Tenn. Code Ann. § 10–7–503, et seq."(citing Capital Case Res. Ctr. of Tenn., Inc. v. Woodall, No. 01–A–019104CH00150, 1992 WL 12217 (Tenn. Ct. App. Jan. 29, 1992) (holding that the District Attorney General could not deny a request for access to the prosecution and police files on a rape/murder case by attorneys representing the person convicted of the crimes in a pending

habeas corpus proceeding in federal court because those files were not exempt from disclosure under the Tennessee Public Records Act)). Although current counsel has made diligent efforts to contact Whitfield and reviewed state files (Docket Entry Nos. 20-1 through 29-5), the appropriate standard under Rule 6(a) is what Petitioner and trial and post conviction counsel did to develop the state record.

Third, the State record reflects that Whitfield was concerned about criminal charges for his acts with Petitioner. "While in Memphis, Mr. Whitfield saw on the news that two people had been shot and killed in a Nashville apartment. Mr. Whitfield said that he did not call the police because he was scared that he might get charged along with the defendant." Long v. State, No. M2008-01820-CCA-R3-PC, 2010 WL 1837934, at *3 (Tenn. Ct. Crim. App. June 17, 2010). Moreover, Whitfield disclosed at trial that he had discussed his testimony with State prosecutors.

A.    I -- they been in here all day, so ...
Q     Okay.  Not today.     Last week -- have you talked to anybody with the Police Department, prior to your testimony today?
A     Yesterday.
Q     Okay.  And have you talked with anybody in the District Attorney's Office, concerning your testimony?
A     Talked to Ms. -- Ms. Miller.

(Docket Entry No. 18-3 at 52-53). The jury heard and the State court found that Whitfield was under duress during his multiple interviews because of Whitfield's criminal history with drug convictions and his concern about being charged given his involvement with Petitioner. Long, 2010 WL 1837934, at *3. The jury was also aware that Whitfield had not been charged. The Court does not discern any testimony in the state trial record by Whitfield denying any promises of favorable treatment to secure his cooperation.

For these collective reasons and the reasons stated earlier, the Court does not deem the

unauthenticated transcript of the undisputed ambiguous videotape to be sufficient showing of good cause for the requested discovery. Moreover, all of this information was available at the time of Petitioner's trial as well as his post conviction proceedings. Absent a showing of good cause that is not presented here, the decision on Petitioner's claims must be decided on the record before the State courts.

## 2. The Motion for an Evidentiary Hearing

Petitioner seeks an evidentiary hearing about the alleged arrest threat to Whitfield and the non-disclosure of that threat. Petitioner also seeks an evidentiary hearing on his two defaulted claims: (1) that his trial counsel failed to create a complete transcript of Joseph Whitfield's second videotaped interrogation with the threat or promise of prosecution of Whitfield and (2) that his trial counsel failed to present expert testimony on the placement of the shell casings that would be probative on whether the door to the victim's apartment could have been closed at the time of the shooting. Citing Martinez v. Ryan, __ U.S. __, 132 S. Ct. 1309 (2012), Petitioner contends that these defaulted ineffective assistance of post conviction counsel claims can be pursued in this action.

For an evidentiary hearing in a habeas action, in the AEDPA, Congress redefined the standards:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) **a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.**

28 U.S.C.§ 2254(e)(2) (emphasis added).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court explained that if the petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the focus is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the matter:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his effort . . . **Diligence for purposes of the opening clause [on Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;** it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

* * *

> **For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.**

* * *

> Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

> **As we hold there was a failure to develop the factual basis of this <u>Brady</u> claim in state court, we must determine if the requirements in the valance of § 2254(e)(2) are satisfied so that petitioner's failure is excused . . . upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.**

Id. at 435, 437, 439-440.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. Abdur' Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Id. at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Id. at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exists to resolve the petitioner's claims, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Kenney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing is still intact following Williams." Abdur' Rahman, 226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse

16

its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d

614, 626-27 (6th Cir. 2005).

For the reasons stated in the analysis of the discovery request concerning an alleged threat

to Whitfield, the Court concludes that Petitioner was aware of the videotape of Whitfield's

second interview prior to his trial and at the time of his state post conviction petition. In both

proceedings, Petitioner had an opportunity to pursue those issues through various discovery

devices as well as a public records request, but did not do so. Thus, the Court concludes that a

hearing on this issue is not justified

As to a hearing on his ineffective assistance of counsel claim in light of Martinez, there,

the Supreme Court created an equitable exception to procedural default that "qualifies Coleman

by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral

proceedings may establish cause for a prisoner's procedural default of a claim of ineffective

assistance at trial." 132 S. Ct. at 1315. The Supreme Court defined "initial-review collateral

proceedings" as proceedings "which provide the first occasion to raise a claim of ineffective

assistance at trial." Id. In Martinez, the Supreme Court expressly recognized that "[d]irect

appeals, without evidentiary hearings, may not be as effective as other proceedings for

developing the factual basis for the [ineffective assistance of trial counsel] claim." Id. at 1318. In

Trevino v. Thaler, __ U.S.__, 133 S. Ct. 1911 (2013), the Supreme Court extended the Martinez

exception where State law "does not expressly *require* the defendant to raise a claim of ineffective

assistance of trial counsel in an initial *collateral review* proceeding....[but the State] law on its face

appears to permit (but not require) the defendant to raise the claim on *direct appeal*." Id. at 1915.

(emphasis in the original)

17

Based upon its analysis of Tennessee's system, this member of the Court concluded, consistent with Trevino, that Tennessee's system by "'design and operation makes it **highly unlikely** in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal'." Morrow v. Brandon, No. 3:06–0955, 2014 WL 49817 at *9 (M. D. Tenn. Jan. 7, 2014) (quoting Trevino, 133 S. Ct. at 1921and citing Fenton v. Colson, No. 3:09cv1057, 2013 WL 704317 at *13 (M. D. Tenn. Feb. 25, 2013) (emphasis in Brandon). In Sutton v. Carpenter, No. 12–6310, 2014 WL 1041695 (6th Cir. March 19, 2014), the Sixth Circuit ruled that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial. Id. at *7 (citing Martinez, 132 S. Ct. at 1320). Although Martinez renders this claim actionable, the necessity of an evidentiary hearing on Petitioner's claims about his counsel is a separate issue.

The Court is not convinced that claims based upon the unauthenticated transcript of the second Whitfield interview are appropriate for an evidentiary hearing. The unauthenticated proof of the second Whitfield interview and the failure to develop the record on this issue given the known facts about the existence of this transcript do not establish due diligence required for an evidentiary hearing. As to Petitioner's trial counsel's failure to secure an expert witness on the location of the bullet casings, Petitioner cites testimony that "Detective Freeman acknowledged that **if** a person went into an apartment, closed the door, and fired a pistol, the shell casings would not have been outside the door and in the door frame." Long, 2007 WL 551306, at *5 (emphasis added). Whitfield did testify that the door was closed when he heard the shots. (Docket Entry No. 18-3, at 67). Yet, "Whitfield explained that the defendant broke the apartment door open with his body. **Once the defendant was inside the apartment, Mr. Whitfield heard**

**a shot, a pause, and then another shot**." State v. Long, No. M2005-02960, 2007 WL 551306, at *3 (Tenn. Ct, Crim. App. Feb. 23, 2009) (emphasis added). According to the Tennessee appellate court's factual findings that are presumed correct, "Officer Atnip interviewed the residents of nearby apartments, but no one saw what happened." Id. at *1. Petitioner fails to cite the other relevant facts found by the state appellate court, including: "Officer Atnip stated that the apartment door was closed when he arrived, so he had to open it before he could enter the apartment;" "Officer Matthew Atnip with the Metropolitan Nashville Police Department testified that he arrived at Falon's apartment and noticed that the door had been 'busted' off the jamb;" "Officer Johnson was sure the casings were not disturbed prior to being photographed;" "On cross-examination, **Officer Johnson noted that when an automatic weapon is fired the shell will eject straight down or behind the shooter**;" and "[w]hen shown a photograph of the doorway into the apartment, Officer Atnip identified a shell casing **in the middle of the door frame.**" Id. at *1, 2 (emphasis added). "When he arrived, several officers were already on the scene, and he noted that the apartment door appeared to have been forced open or kicked in and pieces of the door jamb were on the living room floor. Officer Johnson identified a picture of a shell casing standing on end in the doorway, and another picture of a shell casing found outside of the apartment to the left of the doorway." Id. at *2.

Here, the presumptive facts do not establish a basis for a hearing for expert testimony on ballistics without any evidence that such evidence would create doubt about Petitioner's guilt. As stated forth in the excerpts of the Tennessee appellate court's opinion quoted and emphasized infra, the proof was that the door had been torn from the door jam. The testimony was that a casing could project behind the shooter. A reasonable inference from the proof is that the

shooter's exit from the victim's apartment could have affected the ultimate location of the casing outside the victim's apartment door. Petitioner's trial counsel pursued the closed door theory at trial. Although the closing arguments were not transcribed, Petitioner apparently presented this argument to the jury as reflected in Petitioner's direct appeal that the state courts rejected. (Docket Entry No. 18-7, Petitioner's Brief, at 21).

In sum, Petitioner's counsel seeks to explore factual issues as if he were Petitioner's trial counsel, but that is not the standard for setting an evidentiary hearing under 28 U.S.C.§ 2254(e)(2). Thus, the Court concludes that petitioner's motion for an evidentiary hearing should be denied.

### B. Procedural History

On September 20, 2005, a Davidson County jury convicted Petitioner of one count of first-degree murder and one count of second-degree murder for which Petitioner received consecutive sentences of life for the first-degree murder, and thirty-two years for second-degree murder. On appeal, the Tennessee Court of Criminal Appeals affirmed his convictions and sentences. Long, 2007 WL 551306 at *1. On May 14, 2007, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Long, 2010 WL 1837934 at *1.

On October 10, 2007, Petitioner filed a state post conviction petition with claims of ineffective assistance of trial counsel, prosecutorial misconduct, and failures to disclose exculpatory evidence and to correct the false testimony of State witnesses. After appointment of counsel and an evidentiary hearing, the state trial court denied the petition and on appeal, the Tennessee Court of Criminal Appeals affirmed. Id. On September 21, 2010, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

## C. Review of the State Record

The Tennessee Court of Criminal Appeals found the following facts[4] underlying the

Petitioner's convictions:

> Etasha Ford, Falon [Glaze's] cousin and good friend, testified that the defendant
> and Falon were in a dating relationship for approximately five years before Falon
> broke up with the defendant in October 2003 and started dating Mr. Scruggs. On
> the night of December 23, 2003, Ms. Ford was supposed to take Falon to
> Wal-Mart because Falon's car tires were flat. Ms. Ford called Falon at 11:30 p.m.
> and told Falon to be waiting for her. Mr. Scruggs was at Falon's apartment at the
> time. Ms. Ford arrived at Falon's apartment at midnight and "[p]olice and
> ambulance and fire department [were] everywhere. And ... they were bringing
> Terrance [Scruggs] out on a stretcher."

> Ms. Ford recalled an incident in April 2003 when Falon called her frantically
> screaming that the defendant had just tried to kill her by running her car off the
> road. Ms. Ford later saw Falon's car and noted that the car looked like it had been
> sideswiped on the driver's side. Ms. Ford also recalled an incident that occurred
> about a week before Falon's death when Falon called Ms. Ford and told her that
> the defendant had "just tried to kill [her]. He just put a knife up to [her] neck and
> said that [he was] gonna kill [her], Terrance, and ... everybody that's [at her
> grandmother's house]." On cross-examination, Ms. Ford could not recall whether
> she told the officers at the scene about the two incidents involving the defendant
> because she was hysterical at the time. Ms. Ford admitted that she was not present
> when either of the alleged incidents occurred.

> **Officer Matthew Atnip with the Metropolitan Nashville Police Department
> testified that he arrived at Falon's apartment and noticed that the door had
> been "busted" off the jamb**. Officer Atnip saw an unconscious female lying on
> the floor in the den and a wounded, but conscious male in the bedroom. **Officer
> Atnip interviewed the residents of nearby apartments, but no one saw what
> happened.**

> On cross-examination, Officer Atnip noted that **the female victim was lying on
> the floor with her feet facing the door, but she was far enough away from the
> door for the door to open and close. Officer Atnip stated that the apartment
> door was closed when he arrived, so he had to open it before he could enter**

---

[4]State appellate court opinion findings can constitute factual findings in a habeas action,
Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness
28 U.S.C. § 2254(e).

**the apartment.** Officer Atnip recalled that the male victim was still on the phone with 911 when he arrived, but he did not know whether anyone questioned the male victim about who had shot him. When shown a photograph of the doorway into the apartment, Officer Atnip identified a shell casing in the middle of the door frame. Officer Atnip recalled that the neighbor across the hall from Falon reported seeing or hearing "one person running down the steps." Officer Atnip stated that he was called to the scene right before midnight.

**Metropolitan Nashville Police Officer Burl Eddy Johnson, Jr., testified that** he received a call to report to Falon's apartment at 11:48 p.m. **When he arrived, several officers were already on the scene, and he noted that the apartment door appeared to have been forced open or kicked in and pieces of the door jamb were on the living room floor. Officer Johnson identified a picture of a shell casing standing on end in the doorway, and another picture of a shell casing found outside of the apartment to the left of the doorway. Officer Johnson was sure the casings were not disturbed prior to being photographed. On cross-examination, Officer Johnson noted that when an automatic weapon is fired the shell will eject straight down or behind the shooter.**

Calvin Miles testified that on December 23, 2003, the defendant and Joseph Whitfield, as well as some other friends, were at his house playing video games. The defendant arrived around 10:00 p.m. and had been drinking. Mr. Miles recalled seeing the defendant talk to Mr. Whitfield and Darian Spencer at some point that night. The defendant left around 11:00 p.m. followed by Mr. Whitfield about ten minutes later. Mr. Miles said that the defendant called around 10:00 the next morning looking for Mr. Whitfield, but he said that he did not know Mr. Whitfield's whereabouts.

Mr. Miles stated that he did not know Falon Glaze, but he knew that the defendant had a girlfriend with whom he was having problems. One time in the past, Mr. Miles witnessed a telephone argument between the defendant and Falon, but the defendant "took the conversation on the porch" because he was being loud. On cross-examination, Mr. Miles stated that he had no independent knowledge of what happened at Falon's apartment the night of December 23, 2003.

Joseph Whitfield testified that he knew the defendant for a couple of months prior to the incident in this case. Mr. Whitfield saw the defendant on December 23, 2003, at Mr. Miles' house, and the defendant "was asking everybody would we go somewhere with him." Mr. Whitfield eventually agreed to go with the defendant, but the defendant did not tell him where they were going. They left Mr. Miles' house sometime late in the evening and drove on Interstate-24 until they parked on the side of the interstate behind Murfreesboro Road. The defendant led the way through a hole in a fence, up a hill, and across a parking lot into an apartment

complex.

Mr. Whitfield testified that the defendant led the way to a third-floor apartment, had Mr. Whitfield knock on the door, and when no one answered, the defendant "made his way in." Mr. **Whitfield explained that the defendant broke the apartment door open with his body. Once the defendant was inside the apartment, Mr. Whitfield heard a shot, a pause, and then another shot. Mr. Whitfield remembered hearing a female yell. Mr. Whitfield took off running because he "didn't wanna be in the way of what was coming out that door." As he was running, Mr. Whitfield noticed that the defendant was not far behind him, and they left the apartment complex the same way they entered. The defendant drove Mr. Whitfield back to Mr. Miles' house.**

Mr. Whitfield testified that he asked the defendant what had happened, but the defendant did not say anything. Mr. Whitfield did not see the defendant with a gun until they were running from the apartment. The next day, Mr. Whitfield and his girlfriend went to Memphis for the holidays. While in Memphis, Mr. Whitfield saw on the news that two people had been shot and killed in a Nashville apartment. Mr. Whitfield said that he did not call the police because he was scared that he might get charged along with the defendant.

Mr. Whitfield stated that Mr. Miles called him to say that the defendant was looking for him, but Mr. Miles did not give the defendant Mr. Whitfield's phone number. Mr. Whitfield was contacted by the police through his ex-girlfriend, and he gave a statement on January 30, 2004. In his first interview, Mr. Whitfield told the detective that he "didn't want no part of it." Mr. Whitfield talked to the detective again the next day and admitted that he was present, but did not tell the detective about the gun. Mr. Whitfield admitted that he testified at a hearing and did not mention seeing the defendant with a gun. Mr. Whitfield acknowledged that he had two prior felony drug convictions.

On cross-examination, Mr. Whitfield said that prior to this incident he did not hang out with the defendant. Mr. Whitfield stated that he never showed the police the hole in the fence he and the defendant went through the night of the incident. Mr. Whitfield admitted again that he initially told the police that he did not go with the defendant to Falon's apartment. Mr. Whitfield also admitted that during the second interview he did not mention seeing the defendant with a gun. Mr. Whitfield did not remember telling the police in his second interview that he went to his girlfriend's house and then met the defendant at a grocery store before heading to Falon's apartment.

When asked to recall his testimony at the preliminary hearing, Mr. Whitfield said that he was asked at what point he saw the defendant with a gun, and he responded, "[a]fter we left. After we struck out running." Mr. Whitfield was

shown a transcript of his preliminary hearing testimony where he said that he never saw the defendant with a gun, even after he came out of the apartment. Mr. Whitfield admitted that he did not tell the truth during his two interviews with police or at the preliminary hearing.

Magan Glaze, Falon's sister, testified that the defendant and her sister dated for five years and then broke up in November 2003. Falon became involved with Terrance Scruggs while Falon was still dating the defendant. Magan talked to her sister on the phone between 10:30 and 11:00 p.m. the night she was killed. Magan said that while she was on the phone with her sister, she received a call from the defendant and a man named Joe who were looking for her sister. Magan recalled an incident about a week before Falon's murder when Falon showed up at her house and said that the defendant had just put a knife to her throat and threatened to kill her, her family, and her new boyfriend. On cross-examination, Magan admitted that she was not present when the defendant threatened Falon.

John Bostic testified that he lived in an apartment across the hall from Falon. Mr. Bostic noticed that Falon had a regular male visitor and then in December 2003 started having another male visitor. Mr. Bostic noted that he would still see the first male hanging around the parking lot of the apartment complex. Mr. Bostic recalled that around 11:00 p.m. on December 23, 2003, he heard a loud bang like something getting kicked in, and then a shot and muffled scream. Mr. Bostic then heard a second shot, another muffled scream, and footsteps running down the steps. On cross-examination, Mr. Bostic admitted that he never saw who was involved in the altercation across the hall. Mr. Bostic also admitted that he told Detective Freeman that he thought he heard a car squealing as it pulled away.

Glenn Carter, owner of Carter's Family Florist, testified that the defendant ordered a half-dozen roses around Christmas 2003. The defendant told Mr. Carter that he had messed up and was trying to get his girl back. The defendant later called Mr. Carter and told him that he did not think the flowers had worked. On cross-examination, Mr. Carter acknowledged that it was not unusual for a man to send flowers to his girlfriend.

Medical Examiner, Dr. Tom Deering, testified that he performed the autopsies on the victims and determined that Falon died from a gunshot wound to the chest and Mr. Scruggs died from a gunshot wound to the back. Dr. Deering determined that Falon died within minutes of being shot, but Mr. Scruggs would have survived longer. On cross-examination, Dr. Deering stated that he could not determine which victim was shot first, nor could he determine how close the shooter was to either victim.

Metropolitan Nashville Police Detective Charles Freeman testified that Falon's family pointed to the defendant as a suspect from the beginning. On December 24,

2003, Detective Freeman went to the defendant's house and asked him to come to the police station. The defendant told Detective Freeman that the previous night he had been in class until 8:00 p.m. and rode the bus home where he was the rest of the night. Later, the defendant told Detective Freeman that he had actually received a ride home from a girl in another class. When asked a third time, the defendant said that he had driven home from class but did not want to tell because he was not supposed to be driving. Detective Freeman recalled that he received information from a Mr. Grimes that caused him to question the defendant again. This time the defendant stated that he went to Mr. Grimes' house around 12:30 a.m. the morning of December 24th, and then Mr. Grimes gave him a ride home.

Detective Freeman testified that he received information from Mr. Whitfield about how he and the defendant got into the apartment complex, and he located and videotaped the path they had taken. Detective Freeman noted that there was a hole in the fence through which one could enter into the apartment complex. Detective Freeman said that he never located any suspects other than the defendant.

On cross-examination, Detective Freeman stated that he never asked Mr. Whitfield to accompany him to the scene of the crime and show him the route they took that night. Detective Freeman also stated that he went to the scene and looked for the hole in the fence shortly after interviewing Mr. Whitfield, but was unable to locate the hole. Detective Freeman said that he was able to find the hole in the fence in September 2005 when he went to make the videotape. Detective Freeman admitted that no physical evidence was collected that would place the defendant at the scene of the shootings. **Detective Freeman acknowledged that if a person went into an apartment, closed the door, and fired a pistol, the shell casings would not have been outside the door and in the door frame.**

Long, 2007 WL 551306, at *1-5 (emphasis added). The state appellate court's other pertinent

factual findings are presented in the context of Petitioner's claims.

### D. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997).

Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their

merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law[5] "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, _U.S._, 132 S. Ct. 38, 42 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of th[e] [Supreme] Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. Id. at 43 The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at 44-45. The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state post-conviction

_____

[5] The Supreme Court rendered two relevant decisions on claims for ineffective assistance of counsel, Missouri v. Frye, _ U.S. _, 132 S. Ct. 1399 (2012) and Lafler v. Cooper, __ U.S. _, 132 S. Ct. 1376 (2012), but the Sixth Circuit has held those decisions are not retroactive. In re Liddell, 722 F.3d 737, 738-39 (6th Cir. 2013).

petition. Id. at 45.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA
modified a federal court's role in reviewing state prisoner applications "in order to prevent
federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent
possible under the law." Under the "unreasonable application" clause, a state court judgment
results in an "unreasonable application" of clearly established federal law "if the state court
identifies the correct governing legal principle from [the Supreme] Court's decision but
unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U. S. at
413. The Supreme Court explained that a state court's application of clearly established federal
law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief
"simply because that court concludes in its independent judgment that the relevant state court
decision applied clearly established federal law erroneously or incorrectly. Rather, that
application must also be unreasonable." Id. at 411. A state court's application of federal law is
unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect
that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135
(6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

The Supreme Court reiterated that the claims are to be decided on the record before the
state court:

> In this and related contexts we have made clear that whether a state court's
> decision was unreasonable must be assessed in light of the record the court had
> before it. See Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam) (denying
> relief where state court's application of federal law was "supported by the
> record"); Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (reasonableness of state
> court's factual finding assessed "in light of the record before the court"); cf. Bell v.
> Cone, 535 U.S. 685, 697, n.4 (2002) (declining to consider evidence not presented
> to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-388 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes the state courts' credibility findings. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Denial of Constitutional Right to Present a Defense

This section analyzes Petitioner's claim that the state trial court's exclusion of a videotape that Petitioner sought to admit at trial to prove the inconsistent statements of a key state witness[6] denied him his Sixth Amendment right to confront his accusers and to present a defense. On direct appeal, the Tennessee Court of Criminal Appeals held that the witness's admissions of his inconsistencies rendered admission of the videotape cumulative and thus, was not error.

> At trial, Mr. Whitfield testified that he went to Falon Glaze's apartment with the defendant and saw the defendant break down the door and go inside. He also testified that he heard two shots and a woman's voice before the defendant came back out bearing a handgun. On cross-examination, defense counsel asked Mr. Whitfield about statements he made to the police during his two interrogations and statements made during the preliminary hearing. Mr. Whitfield admitted that he initially told the police that he did not go with the defendant to Falon's apartment that night. Later, defense counsel questioned Mr. Whitfield about his current testimony that he saw the defendant in the possession of a gun when they were leaving the crime scene but had said nothing about seeing a gun before. Mr.

---

[6] In his direct appeal, petitioner presented this claim as follows: "The defendant argues that the trial court erred in preventing him from introducing the videotaped prior inconsistent statements of the state's witness Joseph Whitfield. He argues that he was 'denied his right of confrontation by [not] being allowed complete cross-examination of the witness'." Long, 2007 WL 551306 at * 10.

Whitfield initially responded that he had told the officers he did not see the defendant with a gun on the way to the apartment, and the officers had not asked him if he saw a gun when the defendant was leaving the apartment. However, defense counsel confronted Mr. Whitfield with a transcript from the preliminary hearing where Mr. Whitfield said he did not see a gun, and Mr. Whitfield admitted that his preliminary hearing testimony was not the same as his current testimony. Mr. Whitfield subsequently admitted that he told the police in January 2004 that he was not involved in the incident, told the police in February 2004 that he did not see a gun, and testified at the preliminary hearing that he did not see a gun, which was all contrary to his testimony at trial. Defense counsel then sought to play the videotape of Mr. Whitfield's statements to the police. The trial court hesitated to allow the tape to be played because the court was "not sure there's anything to contradict" and said that defense counsel may want to clarify Mr. Whitfield's testimony. Defense counsel asked a few follow-up questions and made no further attempt to introduce the tape.

The credibility of a witness may be attacked by any party. Tenn. R. Evid. 607. Prior inconsistent statements may be used to impeach the credibility of a witness. Id. at 613. However, extrinsic evidence of a prior inconsistent statement of a witness is inadmissible unless the "witness either denies or equivocates as to having made the prior inconsistent statement." See State v. Martin, 964 S.W.2d 564, 567 (Tenn.1998); see also Tenn. R. Evid. 613(b).

In this case, the record demonstrates that Mr. Whitfield was asked about his two statements to the police and his testimony at the preliminary hearing, and Mr. Whitfield admitted that his trial testimony differed from his previous accounts. The defendant's assertion that he was "denied his right of confrontation by [not] being allowed complete cross-examination of the witness" is without merit because the record clearly indicates that the defendant was allowed to fully cross-examine Mr. Whitfield regarding his various recollections of the incident. Just as observed by the trial court, Mr. Whitfield did not deny the inconsistencies in his statements, therefore the introduction of extrinsic evidence would have been cumulative and not necessary. The defendant is not entitled to relief on this issue.

Long, 2007 WL 551306, at 10-11.

A person has a Sixth Amendment right to confront his accusers. Bruton v. United States, 391 U.S. 123 (1968). The Sixth Amendment right of confrontation focuses on cross-examination of adverse witnesses, subject to limitations of the trial court to avoid harassment, prejudice or danger to witnesses. Douglas v. Alabama, 380 U.S. 415, 418-19 (1965). This right of

confrontation includes "the right physically to face those who testify against [the defendant] and the right to conduct cross-examination". Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). As to the related right to present a defense:

> The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words:
>
>> 'The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.'
>
> The right of the defendant to present evidence 'stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States'.

Taylor v. Illinois, 484 U.S. 400, 409 (1988) (quoting Washington v. Texas, 388 U.S. 14, 18, 19, (1967)).

Here, Petitioner's trial counsel was able to confront Whitfield on his prior inconsistent statements and omissions. To be sure, the presentation of the video on which he made those statements may have had a more demonstrative effect. Yet, given the witness's admissions of his inconsistencies on cross examination, the Court cannot conclude that the State courts' resolution of this claim was an unreasonable application of Petitioner's Sixth Amendment right under clearly established federal law. An issue concerning admissibility of evidence does not rise to a level of constitutional magnitude unless its admission can be viewed as so egregious so as to render the trial fundamentally unfair. Crawford v. Washington, 541 U.S. 36, 51 (2004) ("This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns.").

Petitioner's related claim concerns the trial court's admission of Petitioner's prior bad

acts through several State witnesses. On Petitioner's direct appeal, the Tennessee appellate court

agreed with the trial court that the bad acts testimony fit exceptions to Tennessee's hearsay rule

and some testimony was also admissible as character evidence. The Tennessee appellate court

also concluded that the statements were non-testimonial and thus, their admission did not violate

federal law.

### B. Testimony Regarding Prior Misconduct

**The defendant argues that the trial court erred in allowing the testimony of Etasha Ford and Magan Glaze regarding prior attempts by the defendant to harm Falon Glaze. The defendant argues that this testimony was both hearsay and improper character evidence.**

**Prior to trial, the court conducted a hearing in accordance with Tennessee Rule of Evidence 404(b).** At the hearing, Magan testified that a week before Falon's death, Falon showed up at her house with a shocked, weird look on her face. Falon told Magan that the defendant had just tried to kill her. Falon related the course of events that had just taken place, culminating in the defendant putting a knife to her neck and saying that he was going to kill her and everybody at her grandmother's house-including her new boyfriend. Magan admitted that she did not witness the incident. Magan also recalled that the Sunday prior to Falon's death, Falon received flowers from the defendant apologizing for something. Magan noted that a tire on Falon's car had been slashed that weekend.

Etasha Ford also testified at the hearing. Ms. Ford recalled an incident in April 2003 when Falon called her "screaming and hollering" that the defendant had just tried to kill her by running her car off the road. Ms. Ford later saw the damage to Falon's car, and it appeared to have been sideswiped. Ms. Ford also recalled that about a week prior to Falon's death, Falon called her and said that the defendant had just put a knife to her neck and threatened to kill her, her boyfriend, and "everybody in the house." Ms. Ford noted that Falon was panicking and breathing fast. Ms. Ford stated that the Sunday before Falon's death, the tires on Falon's car appeared to have been cut or had the air let out. Ms. Ford admitted that she did not personally witness the incidents.

**The trial court determined that the witnesses would be allowed to testify regarding Falon's statements, finding that the statements were non-testimonial excited utterances and therefore admissible as exceptions to the rule against hearsay. The court also found that Falon's statements were relevant to prove the defendant's identity as the perpetrator of the offense**

**and probative of his motive and intent to harm Falon. The court determined that the high probative value of the other act evidence was not outweighed by the danger of unfair prejudice; therefore, the other act evidence was not precluded by Tennessee Rule of Evidence 404(b) as improper character evidence. The court concluded that testimony regarding Falon's car having flat tires was not admissible unless there was proof attributing the flat tires to the defendant.**

### 1. Hearsay/Confrontation

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). However, the rules of evidence provide an exception to the hearsay rule allowing hearsay statements to be admissible if they meet the conditions of an "excited utterance." Tenn. R. Evid. 803(2). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. The rationale for admitting an "excited utterance" is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely. State v. Gordon, 952 S.W.2d 817, 819 (Tenn.1997) (citations omitted). In addition, a statement relating to a startling event is typically made while the memory of the circumstance or event is still fresh, thus creating a more accurate testimonial to the event than would be produced by a later in-court description of it. Id. at 819-20.

In order to meet the parameters of the "excited utterance" exception (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress or excitement of the event or condition. State v. Stout, 46 S.W.3d 689, 699-700 (Tenn.2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572 (Tenn.2004); Gordon, 952 S.W.2d at 820. It is reasonable to infer that getting sideswiped while driving and having a knife put to one's neck are exciting or startling events. It is clear that both of Falon's statements relate to the startling events. From Magan and Ms. Ford's testimony at the hearing and trial, it is also clear that Falon made both statements soon after being put in fear for her life. While the record does not reveal the time lapse between the incidents and the statements, both witnesses relayed that Falon seemed breathless, panicked, and shocked when she reported the respective events. Even though Falon's statement to Magan came in response to Magan asking "what's wrong," Magan's query was an innocuous question brought on by Falon showing up at her door with "a weird look in her face, like

32

something had just happened." In sum, **we conclude that Falon's statements were made after a startling event, were related to the event, and were made while under the stress and excitement of the event. As such, the trial court properly admitted Falon's statements under the excited utterance exception to the rule against hearsay.**

Even though **we have determined that Falon's statements were properly considered as an exception to the rule against hearsay, the defendant nevertheless has the right to confront witnesses who present testimony against him under the Sixth Amendment to the United States Constitution. Although the defendant does not argue that his rights under the Confrontation Clause were violated by the admission of Falon's excited utterances, we address the possible confrontation implications below.**

The Sixth Amendment to the United States Constitution provides the accused with the right to be confronted with witnesses against him. This constitutional guarantee is applied to the states via the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965). In addition, article I, section 9 of the Tennessee Constitution guarantees the accused the right "to meet the witnesses face to face."

The United States Supreme Court in **Crawford v. Washington, 541 U.S. 36 (2004), overturned the previously well-settled rule of Ohio v. Roberts, 448 U.S. 56 (1980), and held that the Confrontation Clause prohibits the admission of testimonial hearsay against a criminal defendant without a showing that the witness who made the statement is unavailable, and that the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U .S. at 68. According to Crawford, proper Sixth Amendment Confrontation Clause analysis turns on whether a particular statement is testimonial or non-testimonial in nature. Id. The Court noted that where non-testimonial hearsay is involved, the Confrontation Clause is not implicated and the states are free to determine whether the statement is admissible under its own hearsay law. Id. Therefore, we must determine whether Falon's excited utterances to her cousin and sister were testimonial or non-testimonial in nature.**

Recently, in State v. Maclin, 183 S.W.3d 335 (Tenn.2006), the Tennessee Supreme Court held that "the language of Crawford points to an objective standard-that is, whether the statement was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 349 (citation and internal quotations omitted). In determining whether an excited utterance is testimonial or non-testimonial, the Maclin court adopted a totality of the circumstances approach with the primary consideration being "whether the declarant was acting as a 'witness'-that is, 'bearing testimony' against the accused." Id. at 351. Following

33

Crawford, the Maclin court defined testimony as: "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. The Maclin court then noted that if a court concludes a statement is non-testimonial, the court must, consistent with Ohio v. Roberts, also determine whether the out-of-court statement falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Id.(quoting Roberts, 448 U.S. at 66).

In this case, **we conclude that Falon's statements to her cousin and sister were non-testimonial in nature. An objective witness would not reasonably believe that Falon's statements were made when she was acting as a witness against the defendant, or made for use in a future legal proceeding. Instead, Falon was voicing her concerns to members of her family relating that the defendant had just tried to hurt her.**

Having concluded that Falon's statements to her sister and cousin were non-testimonial in nature, we must now analyze her out-of-court statements under the framework set out in Ohio v. Roberts. Id. As we determined above, Falon's statements were properly admitted as excited utterances. Both the United States Supreme Court and the Tennessee Supreme Court have held that the excited utterance exception to the rule against hearsay is "firmly rooted." See White v. Illinois, 502 U.S. 346, 355 n. 8 (1992); Maclin, 183 S.W.3d at 353. Accordingly, the defendant's confrontation rights were not violated by the admission of the non-testimonial excited utterances of victim Falon Glaze.

## 2. Character Evidence

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." Id. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. at 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. at 403.

Evidence of a defendant's character offered for the purpose of proving that the defendant acted in conformity with that character is not admissible. Id. at 404(a). Additionally, evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. Id. at 404(b). Such evidence may be admissible, however, for "other purposes" if the following conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Id. Our supreme court has determined that such "other purposes" includes demonstrating identity, motive, or intent. State v. Berry, 141 S.W.3d 549, 582 (Tenn.2004). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. James, 81 S.W.3d 751, 759 (Tenn.2002); State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997). When attempting to exclude otherwise admissible and relevant evidence, the individual seeking exclusion bears a "significant burden of persuasion." James, 81 S.W.3d at 757-58.

Upon review, **we discern no abuse of discretion in the trial court allowing testimony from Magan Glaze and Etasha Ford regarding prior violent acts of the defendant toward Falon Glaze. Evidence of the defendant running Falon off the road in April 2003 and putting a knife to her neck and threatening her life a week prior to her murder was admitted not to prove the defendant acted in accord with his character but as part of the proof establishing that he was a jaded ex-boyfriend. The previous "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn.1993). As found by the trial court, the probative value of this evidence is not outweighed by the danger of unfair prejudice.** See Tenn. R. Evid. 404(b)(4). The defendant is not entitled to relief on this issue.

Long, 2007 WL 551306, at *6-10 (emphasis added).

As stated earlier, a claim based upon the admissibility of evidence requires a showing that the admission of the testimony was so egregious as to result in a fundamentally unfair trial.

Crawford, 541 U.S. at 51 ("This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns."). A question of purely state law rarely warrants habeas relief unless the exclusion arises to the level of a due process violation. Estelle v. McGuire, 502 U.S. 62, 70 (1991). In a word, this constitutional right is not offended by the introduction of hearsay so long as the hearsay contains indicia of reliability, a condition for exceptions to the hearsay rule. See United States v. Inadi, 475 U.S. 387, 391 n.3 (1986); Dutton v. Evans, 400 U.S. 74, 89 (1970) (plurality opinion). To warrant habeas relief, the excluded evidence must be critical, that is, the evidence must "tend to exculpate" the petitioner and also must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994). See also Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988) ("We begin our discussion with the clearly established rule that errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding.") (citations omitted).

From this Court's review, the Tennessee appellate court could reasonably conclude that the trial court followed appropriate procedures in ruling on the admissibility of the prior bad acts evidence and also properly found these acts to be admissible as evidence of the Petitioner's character. As to the hearsay evidence, the State courts concluded that the challenged evidence qualified as exceptions to the hearsay rule. The State courts also concluded that these statements were non-testimonial and admissible consistent with Crawford. This Court cannot deem the State courts' determinations of these evidentiary issues unconstitutional to render Petitioner's trial fundamentally unfair. Thus, the Court concludes that this claim does not provide a basis for habeas relief.

## 2. Insufficiency of the Evidence

For this claim, the Tennessee Court of Criminal Appeals found that the State's proof satisfied the requirements for Petitioner's convictions. The facts underlying Petitioner's convictions are set forth supra at 21-25. In rejecting this claim, the Tennessee appellate court cited state and federal law and reasoned as follows:

> First degree premeditated murder is statutorily defined as "[a] premeditated and intentional killing of another." Tenn.Code Ann. § 39-13-202(a)(1). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. § 39-13-202(d). In other words, the "intent to kill" must have been formed prior to the act of murder itself, and the accused must be sufficiently free from excitement and passion. Id. Whether premeditation is present is a question of fact for the jury,\ and it may be determined from the circumstances surrounding the offense.

> Bland, 958 S.W.2d at 660; State v. Anderson, 835 S.W.2d 600, 605 (Tenn.Crim.App.1992). In particular, declarations by the defendant of an intent to kill and the use of a deadly weapon upon an unarmed victim are evidence of premeditation. See Bland, 958 S.W.2d at 660. The establishment of the motive for the killing is another factor from which the trier of fact may infer premeditation. State v. Leach, 148 S.W.3d 42, 54 (Tenn.2004).

> Second degree murder is the "knowing killing of another." Tenn.Code Ann. § 39-13-210. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20). The identity of the offender is an essential element of any crime. Rice, 184 S.W.3d at 662 (citing State v.Thompson, 519 S.W.2d 789, 793 (Tenn.1975)).

> In this case, we conclude that the direct and circumstantial evidence presented at trial was sufficient to support the defendant's convictions. Taken in the light most favorable to the state, the evidence shows that the defendant gained access to Falon's apartment through a hole in the perimeter fence. The defendant "made his way" inside the apartment, after which, two gunshots sounded and a woman screamed. The defendant had a gun when he left the apartment. Magan Glaze talked to her sister on the phone between 10:30 and 11:00 p.m. the night she was killed, and while she was on the phone with her sister, Magan received a call from the defendant and a man named Joe who were looking for her sister. During his investigation, Officer Freeman located a hole in the fence, and the other officers noticed that Falon's apartment door jamb was "busted".

Mr. Whitfield's testimony directly linked the defendant to the murders, and Etasha Ford and Magan's testimony revealed that the defendant had previously made threats and violent attacks on Falon Glaze. While Mr. Whitfield's testimony was shown to be inconsistent with his previous statements, Mr. Whitfield was thoroughly cross-examined at trial and the jury was able to assess his credibility.

The defendant argues that the placement of the shell casings at the scene discredits Mr. Whitfield's testimony that the apartment door was shut when the shooting occurred. However, it is possible that the evidence was moved from its original location when the defendant exited the apartment. It is also possible that the evidence was moved before Officer Johnson noted the location of the casings. Again, all factual issues raised by the evidence were resolved by the jury as the trier of fact. Bland, 958 S.W.2d at 659. We will not second-guess the determinations made by the jury.

We conclude that the defendant has failed to prove that no rational trier of fact could have found him guilty of first and second degree murder beyond a reasonable doubt. Accordingly, the defendant is not entitled to relief on this issue.

Long, 2007 WL 551306 at *12-13.

For Fourteenth Amendment claim based upon insufficient evidence, <u>Jackson v. Virginia</u>, 443 U.S. 307(1979), set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction.

...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether <u>it</u> believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt**. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution**. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental

protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Jackson, 443 U.S. at 324. Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam) and such evidence need not remove every reasonable hypothesis except that of guilt. Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution, Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985).

Hearsay evidence can be used to support a state conviction provided it qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993). It is unnecessary to establish the unavailability of the declarant, if the hearsay statements were made in a prior court proceeding. United States v. Inadi, 475 U.S. 387, 394 (1986).

Given Whitfield's testimony, the State had direct evidence of Petitioner's presence at the scene where he surreptitiously entered the area of the victim's apartment, forced the door to the victim's apartment off the hinges and shortly thereafter there were two gunshots and a scream from inside the victims' apartment. The State's proof was that Petitioner had a weapon when he left the apartment after of the murders. Other witnesses testified about the Petitioner's prior

threats and violent attacks of one of the victims. Considering this proof in a light most favorable to the State, given the jury's verdict, the Court concludes that the State courts reasonably determined this claim under clearly established state law.

### 3. Ineffective Assistance of Counsel Claims

On his post conviction appeal, Petitioner presented several claims that he received ineffective assistance of counsel at trial involving his trial counsel's failure "to call certain witnesses to testify at trial on his behalf." Long, 2010 WL 1837934 at *1. The particular claims were described as follows: "Petitioner contended that trial counsel's assistance was deficient because he did not challenge Detective Freeman's testimony on direct examination that there were no other suspects in the case. Petitioner submitted that Mr. Williams' possession of the murder weapon clearly made him a suspect in the case. Petitioner stated that trial counsel refused to call his alibi witnesses because trial counsel believed the State's case was "weak." Id. at * 6. Also, "Petitioner argues that trial counsel's assistance was ineffective because he failed to call his parents to testify at trial as alibi witnesses. Petitioner submits that the importance of this testimony is increased by the fact that only Mr. Whitfield's testimony placed him at the scene of the crimes." Id. at *9. The Court addresses these claims in seriatim.

### a. Failure to Call the Williams Witnesses Claim

The first of these claims is that his trial counsel was inadequate for his failure to call Terrio Williams and Ann Michele Williams as defense witnesses about the discovery of the murder weapon. On Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals found, in pertinent part, that Petitioner failed to prove that the Williamses would not have presented any favorable testimony.

Petitioner's trial counsel testified that he met with Petitioner at least twelve times prior to trial. ...

Trial counsel acknowledged that there was no physical evidence linking Petitioner with the commission of the offenses. **Trial counsel said that he was aware before trial that the murder weapon had been found in the possession of Terrio Williams approximately nine months after the commission of the offenses. Trial counsel said that he made several attempts to interview Mr. Williams, but Mr. Williams refused to talk to him. Trial counsel stated, "[I] did not want to put somebody on the stand that I didn't know what he was going to say." Trial counsel believed, however, that Mr. Williams' possession of the murder weapon was brought out during the cross-examination of one of the State's witnesses. Trial counsel acknowledged that he did not attempt to interview Anne Michelle Williams who was with Mr. Williams when Mr. Williams was arrested because she was not charged with any crime**

Petitioner submitted that Mr. Williams' possession of the murder weapon clearly made him a suspect in the case. Petitioner stated that trial counsel refused to call his alibi witnesses because trial counsel believed the State's case was "weak"

*          *          *

### A. Terrio Williams and Anne Michele Williams

Petitioner argues that trial counsel's assistance was ineffective because he failed to call these witnesses to testify at trial. Petitioner submits that there was no physical evidence placing him in the victim's apartment at the time of the murders, and Mr. Williams' possession of the murder weapon after the commission of the offenses made him a suspect in the case.

**Approximately nine months after the commission of the offenses, a search warrant, arising out of an unrelated matter, was executed on Mr. Williams' vehicle. During the search, a gun was found, and Mr. Williams was charged with possession of a weapon by a convicted felon. Subsequent testing revealed that the gun found in Mr. Williams' vehicle was the gun used to commit the murders of Ms. Glaze and Mr. Scruggs. Ms. Williams, who was with Mr. Williams when the vehicle was searched, was not charged with any offense. Trial counsel testified that he was aware of this information prior to trial. He attempted to interview Mr. Williams' on several occasions, but Mr. Williams refused to talk to him. Trial counsel, therefore, decided not to call Mr. Williams as a witness because he did not know what Mr. Williams would say at trial. Trial counsel stated that he did not interview Ms. Williams because she was not charged with any offense.**

Although trial counsel testified at the post-conviction hearing that he believed that he had brought out the circumstances surrounding the discovery of the murder weapon at trial, **the post-conviction court noted that its review of the record revealed that the issue**

41

**was not raised at trial during the cross-examination of the State's witnesses. Nonetheless, the post-conviction court found that Petitioner had failed to show that he was prejudiced by trial counsel's decision not to call Mr. Williams as a defense witness at trial.**

"Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." Baxter, 523 S.W.3d at 935. "And if counsel's choices not to raise substantial defenses are professionally unreasonable 'considering all the circumstances,' counsel's performance is deficient." Pylant v. State, 263 S.W.3d 854, 868 (Tenn.2008) (citing Strickland, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674). **In the instant case, trial counsel attempted to interview Mr. Williams, but Mr. Williams refused to talk to him. Without knowing what Mr. Williams would have disclosed at trial, trial counsel made a strategic decision not to call him to testify, which decision, under the circumstances presented, did not fall below the standard of reasonableness demanded of defense counsel.**

**Nonetheless, even if trial counsel's assistance in this regard was deficient, Petitioner did not call either Terrio Williams or Anne Michele Williams to testify at the post-conviction hearing. Whether their testimony would have been favorable to Petitioner, therefore, is merely speculation. Although Petitioner insists that Mr. Williams' possession of the weapon made him a viable suspect, it is just as possible that exploring the weapon's chain of custody might have led back to Petitioner. As for Ms. Williams, without her testimony at the post-conviction hearing, Petitioner has failed to show that she had any relevant evidence concerning the gun or that she even knew anything about the weapon.**

\*                              \*                              \*

**Based on our review, we conclude that even if trial counsel's assistance in regard to Mr. Williams' possession of the murder weapon some nine months after the murders was deficient, the evidence does not preponderate against the post-conviction court's finding that Petitioner has failed to establish prejudice.** Accordingly, Petitioner is not entitled to relief on this issue.

Id. at \*5, 6, 8, 9 (emphasis added).

The Court must consider the totality of the circumstances in assessing whether trial

counsel performed deficiently and if so whether counsel's performance resulted in prejudice.

Strickland v. Washington, 466 U.S. 668, 687 (1984). As the Supreme Court has explained:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

42

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "'to conduct [] constitutionally adequate pretrial investigation into potential mitigation evidence" can "hamper[] [their] ability to make strategic choices'." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005) (citations omitted). A court must examine not only the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, No. 98-1616, 2000 WL 712376, at *4 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability "'that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome'". Williams, 529 U.S. at 390-91 (citation omitted). In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

Upon review of the factual record, the State courts found a lack of prejudice in trial counsel's cited deficiencies for failing to call Terrio Williams and/or Ann Williams. The murder weapon was found in Terrio Williams's vehicle nine months after the murder. The State court

found that emails were exchanged between the State prosecutor and Petitioner's trial counsel about the discovery of the weapon and the dispute of who placed the weapon in Terrio Williams's vehicle. With this record, the State courts could reasonably conclude that Petitioner's counsel's performance was deficient. Yet, as the State courts noted, neither of the Williamses nor the other person identified in the emails was called to testify at the post conviction hearing with any exculpatory evidence. Petitioner has not shown that either of the Williamses had any ties to the victim or any violent history with either of the victims that Petitioner had. Nor is there any showing that the Williamses were in the area of the murders on the night of the shootings. There was not any evidence of a burglary in connection with the shootings at the victim's apartment. Thus, in this factual context, the Court concludes that the State courts could reasonably conclude that Petitioner had not demonstrated the prejudice required by <u>Strickland</u> to be entitled to relief on this claim.

### b. The Freeman Cross Examination Claim

Petitioner's next claim is that his trial counsel was inadequate for failing to explore fully on cross-examination of Detective Freeman that the murder weapon was found nine months after the murder in the Terrio Williams's vehicle. Petitioner contends such proof is suggestive of other murder suspects. On this claim, the State courts found a lack of prejudice in trial counsel's deficiencies for failing to present the circumstances of the recovery of the murder weapon during the testimony of Detective Freeman. The Tennessee appellate court reasoned as follows:

> Petitioner contended that trial counsel's assistance was deficient because he did not challenge Detective Freeman's testimony on direct examination that there were no other suspects in the case. Petitioner submitted that Mr. Williams' possession of the murder weapon clearly made him a suspect in the case. Petitioner stated that trial counsel refused to call his alibi witnesses because trial counsel believed the State's case was "weak."

*          *          *

Petitioner also challenges trial counsel's failure to cross-examine Detective Freeman at trial about the circumstances surrounding the discovery of the murder weapon. The extent of either trial counsel's or the State's investigation of Mr. Williams was not developed at the post-conviction hearing. The record, however, contains a brief exchange of e-mails between the prosecutor and Petitioner's first appointed counsel which were attached to Petitioner's post-conviction petition as an exhibit. The e-mails indicate that Detective Freeman interviewed Mr. Williams who stated that Sergio Aquila put the gun in Mr. Williams' vehicle, and that Mr. Aquila denied doing so. **Based on this information, the State informed Petitioner's counsel that it did not intend calling Mr. Williams as a witness. Petitioner, however, did not call Detective Freeman as a witness at the post-conviction hearing to demonstrate whether any further delving into the chain of custody of the murder weapon would have produced evidence favorable to Petitioner.**

Based on our review, we conclude that even if trial counsel's assistance in regard to Mr. Williams' possession of the murder weapon some nine months after the murders was deficient, the evidence does not preponderate against the post-conviction court's finding that Petitioner has failed to establish prejudice. Accordingly, Petitioner is not entitled to relief on this issue.

<u>Long</u>, 2010 WL 1837934, at *6, 9.

On this claim, Petitioner did not call Freeman at the post conviction hearing and the State courts found the lack of any proof of prejudice. For the reasons stated by the Court on Petitioner's claim about the Williamses, there are not any other facts cited that would have demonstrated any prejudice about the discovery of the weapon. Thus, the Court concludes that the State courts could reasonably determine that Petitioner had not demonstrated any prejudice, required by <u>Strickland</u>, for this related claim.

**c. Failure to Call Petitioner's Parents as Alibi Witnesses Claim**

As to Petitioner's claim that his trial counsel failed to call Petitioner's parents as alibi witnesses, in the State post conviction appeal, "Petitioner argue[d] that trial counsel's assistance was ineffective because he failed to call his parents to testify at trial as alibi witnesses. Petitioner

46

submits that the importance of this testimony is increased by the fact that only Mr. Whitfield's testimony placed him at the scene of the crimes." Long, 2010 WL 1837934 at *9. The Tennessee appellate court did not find any prejudice from this omission of trial counsel:

> **Trial counsel stated that he discussed a potential alibi defense with both Petitioner and his mother, Carolyn Long. Trial counsel said that he did not recollect either Petitioner or Ms. Long telling him that Petitioner was at home with his parents on the night of the murders. If Petitioner had told him that and the alibi could have been verified, trial counsel stated that he would have submitted the evidence. However, the information provided by Petitioner during these pre-trial discussions about his activities on December 23, 2003, was difficult to reconcile with the evidence the State would present during its case-in-chief. Trial counsel stated, "[I]t did not seem like something that I could put before the Court."**

> \* \* \*

> On cross-examination, trial counsel stated that he had been a police officer for sixteen years prior to obtaining his law degree. Trial counsel said that at the time of Petitioner's trial, he had been practicing law for approximately ten years in the field of criminal law. Trial counsel reiterated that he investigated Petitioner's alibi evidence and believed that presentation of the evidence would not be beneficial to Petitioner.

> **Petitioner said that he learned about Ms. Glaze's death from his mother the day after the murders. Petitioner stated that on December 23, 2003, he attended a drug class from 6:00 p.m. until 8:00 p.m., and then returned home because the terms of his probation imposed an 8:00 p.m. curfew. Petitioner said that he did not leave his parent's house again until approximately 8:00 a.m. the following day when he went to Mr. Grimes' house. Petitioner denied that he told the investigating officers that he went to a party at Mr. Grimes' house at approximately 12:30 a.m. on December 24, 2003, and insisted that other aspects of his written statement were inaccurate as well.**

> \* \* \*

> Carolyn Long, Petitioner's mother, testified that she arrived home on December 23, 2003, at approximately 5:00 p.m., and Petitioner arrived home at approximately 8:00 p.m. Ms. Long stated that Petitioner helped her set up a Play Station II at approximately 11:00 p.m. Ms. Long then went to bed around 11:40 p.m. Ms. Long heard Petitioner coughing about ten minutes later, and then she fell asleep again. Ms. Long stated that it took between twenty and twenty-five minutes to drive from her house to Ms. Glaze's apartment.

Raymond Long, Sr., Petitioner's father, testified that Petitioner arrived home on December 23, 2003, at approximately 8:00 p.m. Mr. Long said that Petitioner helped him fix a television set until approximately 10:30 p.m. Mr. Long stated that the evening news was just concluding when he turned the television set on. Mr. Long fell asleep around 11:00 p.m. Mr. Long said that he did not hear any noises in the house after that time.

* * *

"When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." Pylant, 263 S.W.3d at 869 (citations omitted). Ms. Long's and Mr. Long's post-conviction testimony that Petitioner was at home with them at the time of the commission of the offenses would have been both admissible and material at trial. However, in addition to admissibility and materiality, the post-conviction court must also assess the witnesses' credibility when reviewing counsel's decision not to present the proffered testimony under an ineffective assistance of counsel challenge. Id. at 869-70 (citations omitted); Vaughn v. State, 202 S.W.3d 106, 123 (Tenn.2006)

At the post-conviction hearing, trial counsel testified that he had several discussions with Petitioner and Ms. Long concerning a possible alibi offense. Trial counsel did not recollect either Ms. Long or Petitioner telling him that Petitioner was at home from 8:00 p.m. until nearly midnight on December 23, 2003. Trial counsel explored an alibi defense but ultimately concluded that he did not possess credible evidence to present to the jury concerning Petitioner's whereabouts on the night of the murders.

The post-conviction court found:

> **it [is] highly suspect and nearly implausible that a criminal defense attorney with ten years trial experience when presented with a credible alibi would choose not to present it at trial. Rather, more likely as the petitioner said in his statement to the police, he had left the apartment in the early morning hours of the incident. Additionally, two independent witnesses placed the petitioner at a party, leaving and going with one of those witnesses to the scene of the homicides. The Court accredits the testimony of trial counsel that he was not presented with credible alibi witnesses and the alibi did not fit the time line of other evidence.**

"**Great weight is given to a trial court's assessment of credibility.**" Vaughan, 202 S.W.3d at 123 (citing Burns, 6 S.W.3d at 461). Based on our review, we

conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to prove by clear and convincing evidence that trial counsel's assistance in this regard was deficient. Petitioner is not entitled to relief on this issue.

Long, 2010 WL 1837934, at *5, 6-7, 9-10. Based upon these findings and citing state and federal law, the Tennessee appellate court found Petitioner's ineffective assistance of counsel claims to be without merit for the lack of evidence of prejudice. Id. at *10.

A defense counsel's failure to call alibi witnesses can be grounds for ineffectiveness. Matthews v. Abramajtys, 319 F.3d 780, 789 (6th Cir. 2003); Wilson v. Cowan, 578 F.2d 166, 168 (6th Cir. 1978). Such a claim especially warrants relief where defense counsel promises the jury an alibi witness and does not call such a witness. Anderson v. Butler, 858 F.2d 16, 17-18 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that has been promised in an opening."). Petitioner cites a decision arising from this Court, Caldwell v. Lewis, 414 Fed. Appx. 809 (6th Cir. 2011), where the Sixth Circuit reversed an order denying the writ and held that a defense counsel's decision not to call alibi witnesses constituted deficient and prejudicial assistance. There, the Sixth Circuit explained:

> Trial counsel has been found ineffective when he or she fails to present exculpatory testimony. See Stewart, 468 F.3d at 355–61. In fact, this Court has recognized that when trial counsel fails to present an alibi witness, "[t]he difference between the case that was and the case that should have been is undeniable." Id. at 361. **This Court has held that the failure to produce an alibi witness at trial was prejudicial under Strickland, even where the state post conviction court said the alibi witnesses would have been trial. See Bigelow v. Havilnd, 576 F.3d284, 291 (6th Cir 2009). This Court has also found a Strickland violation where counsel failed to present three favorable witnesses even though the state post convict ion court said one witness was "not particularly helpful" and another was "incredible." See Ramonez, 490 F.3d at 485–86. The prosecution chiefly relied on two witnesses and the defense had at least two witnesses to establish an alibi. Thus, the harm here is especially problematic where the jury was promised they would hear from those alibi witnesses and those witnesses easily could have tipped the balance**

**and resultantly, had the scales weighed in favor of the Caldwells.**

In Harrison v. Motley, trial counsel promised the jury he would present an alibi defense during his opening statements. 478 F.3d 750, 752 (6th Cir.2007). One witness recanted prior to trial, the second alibi witness recanted after the trial began, and another witness had credibility issues due to allegations of bribery. Id. at 757–58. Trial counsel called no witnesses. Id. at 753. This Court found trial counsel's actions did not prejudice the defense despite counsel's failure to present an alibi as promised due to recanting by the witnesses and the existence of severe credibility issues. Id. at 758–59; see also Poindexter v. Mitchell, 454 F.3d 564, 574–75 (6th Cir.2006) (rejecting ineffective assistance of counsel claim where trial counsel promised an alibi defense in opening statement based upon the defendant's insistence, but also "prepared the jury for the probability that no alibi would be presented" and declined to present alibi where dogged investigation failed to substantiate alibi.)

Harrison is readily distinguishable from the facts here, and dictates that this court find counsel's decision objectively unreasonable and prejudicial. Lester told two stories—an inculpatory one and an exculpatory one—and the jury was to decide on which was true. The government bolstered Lester's inculpatory story with Roberts's testimony. Defense counsel could have bolstered Lester's exculpatory story by calling several witnesses, but counsel chose not to, despite having promised to produce them during opening statements. Contrary to Harrison, no recantations by the witnesses preceded trial or occurred during trial. **The wives were ready to give live, sworn testimony that the Caldwells were at home during the fire. By promising the testimony of the wives and not producing them, defense counsel exacerbated the error of not calling them, and "the jury likely concluded that counsel could not live up to the claims made in the opening."** Harris v. Reed, 894 F.2d 871, 879 (7th Cir.1990).

The dissent improperly characterizes Goff's testimony as equally forceful and equivalent to Bridgett and Gayle's ready testimony that would have established the Caldwells' alibi. As stated herein, the allusion to Bridgett and Gayle's ready alibi testimony by Goff is far from equivalent to having Bridgett and Gayle establish an alibi for Stevie and Randy in court. Also, **the Caldwells' father was willing to give testimony indicating that Stevie and Randy were at home about an hour before the fire started. Further, Dildine was ready to testify that Gist had a dispute over money with Lester's father shortly before the fire, and would have given the jury reason to believe that Lester was lying to protect his father, Wayne, or his father's associates. Contrasting the ready testimony of Bridgett, Gayle, the Caldwells' father, and Dildine with the testimony of Lester who admittedly gave inconsistent statements, Roberts, and remaining circumstantial evidence of a cigarette lighter, gallon jugs which many in the community used to carry fuel, and the testimony by two individuals that they heard a car with a loud muffler, also common to many in the**

**community, there is a reasonable probability that the results would have been different had trial counsel not erred. Accordingly, we find that Petitioners met their burden of proving prejudice**.

Id. at 818-19 (emphasis added).

The Court agrees that some of the facts here are similar to the facts in Caldwell, but the Court also finds material factual differences. Here, as in Caldwell, the Petitioner's family members, his parents were ready to testify as alibi witnesses, that their son was at their residence about the time of the crime, but were not called. As the State witness in Caldwell, Whitfield, the State's key witness, was subject to multiple inconsistent statements for which alibi proof could have an impact on the jury's verdict. Unlike the relatives in Caldwell, Petitioner's parents are not described as giving prior inconsistent statements. In addition, unlike Caldwell, there is not another witness who effectively provides the parents' testimony about the alibi. Also unlike Caldwell, Petitioner's counsel did not promise the jury testimony from alibi witnesses.

Significantly, here, the State courts found that Petitioner's trial counsel effectively denied that Petitioner or his mother provided proof of an alibi. Petitioner's counsel testified that he discussed an alibi defense with Petitioner and his mother. Petitioner's counsel recalled the interview, but did not recall Petitioner's parents telling him what the testified to at the post conviction hearing. If they had so testified, Petitioner's trial counsel stated that he would have presented their proof at trial. The State courts found that trial counsel "**did not recollect either Petitioner or Ms. Long telling him that Petitioner was at home with his parents on the night of the murders**." Long, 2010 WL 1837934, at * 6 (emphasis added).. For the same reasons, in the post conviction proceedings, the State courts rejected the credibility of Petitioner's parents. In sum, the State courts credited trial counsel's failure of recollection to conclude that the facts for

Petitioner's parents' alibi was not available at the time of Petitioner's trial. This presumption of correctness of the State courts' findings attaches to the state courts' credibility findings. Skaggs, 235 F.3d at 266.

### d. The Ballistics Expert Claim

The final subpart of Petitioner's ineffective assistance of counsel claims is that his trial counsel failed to present expert testimony on the placement of the shell casings that would be probative on whether the door to the victim's apartment could have been closed at the time of the shooting. First, this claim is procedurally defaulted without a showing of cause or prejudice to excuse this default. On the sufficiency of the evidence claim, Petitioner's trial counsel argued the probative value of the casing outside the apartment door, but the Tennessee appellate court rejected that argument. Long, 2007 WL 551306 at *13. As stated earlier on the Petitioner's request for an evidentiary hearing, Petitioner did not tender any expert proof in this action that would support this claim. This claim is without merit

### 4. The Brady/Giglio claims

The bases for one of these claims were analyzed in the earlier discussion on Petitioner's motions for discovery and an evidentiary hearing, The first claim is that the State prosecutors failed to produce exculpatory and impeachment evidence about a warrant for the witness. The second claim is that the State prosecutors withheld evidence regarding a deceptive polygraph examination of Terrio Williams and the deferment of gun charges against Williams. Petitioner also asserts a claim that the State prosecutor withheld impeachment evidence of a threat to Calvin Miles's probation status.

In addition to his earlier response on the Whitfield warrant issue, the Respondent

contends that Petitioner fails to establish the materiality of these alleged facts and Petitioner did

not call Williams at the post-conviction hearing to establish that this evidence was favorable to

him or was actually suppressed. In addition, Respondent asserts these claims are procedurally

defaulted without any showing of cause or prejudice. Respondent further contends that these

claims do not satisfy the pleading requirements of Rule 2(c) of the Rules Governing Section

2254 Actions.

Under Rule 2(c), a habeas petition must "specify all the grounds for relief available to the

petitioner" and "state the facts supporting each ground." McFarland v. Scott, 512 U.S. 849, 860

(1994) ("the habeas petition, unlike a complaint, must allege the factual underpinning of the

petitioner's claims"). "'[N]otice pleading' is not sufficient, for the petition is expected to state

facts that point to a real possibility of constitutional error." Rule 4, Habeas Rules, advisory

committee's note (quoting Aubut v. State of Maine, 431 F.2d 688, 689 (1st Cir. 1972); see also

Mayle v. Felix, 545 U.S. 644, 655-56 (2005) (Rule 2(c) demands more than the "fair notice"

required in Fed. R. Civ. P. 8

to assist the district court in determining whether the case can be summarily dismissed).

As to the Brady claim based upon the alleged Whitfield warrant, for the reasons stated on

the Petitioner's motions for discovery and an evidentiary hearing, the Court concludes that this

claim is procedurally defaulted without any showing of cause or prejudice. The Court also

concludes that Petitioner has not submitted any admissible evidence for this claim.

For Petitioner's other Brady claim based upon the alleged Terrio Williams's polygraph

and deferral of gun charges against him as well as the alleged threat to Miles's about his

probation status, Petitioner never presented these claims to any state court nor demonstrated a

factual basis in this action for these claims to satisfy <u>Brady</u> or <u>Giglio</u> so as to excuse his procedural defaults of these claims. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263 (1999).

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

Entered this the 16th April, 2014.

William J. Haynes, Jr.
Chief United States District Judge